
DA 07-0081

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 173

JOHN RICHARDS and SEELEY LAKE
READY MIX COMPANY, a Montana Corporation,

Plaintiffs and Appellants,

v.

JTL GROUP, INC., a Montana corporation,

Defendant and Appellee.

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV 05-520
Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Dennis E. Lind, Trent N. Baker; Datsopoulos, MacDonald & Lind, P.C.;
Missoula, Montana

For Appellee:

Susan G. Ridgeway, Christopher B. Swartley; Attorneys at Law;
Missoula, Montana

Submitted on Briefs: December 19, 2007

Decided: May 19, 2009

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     This case concerns a dispute over a sale agreement for a ready mix concrete plant in Seeley Lake entered into by John Richards and JTL Group, Inc. Richards and Seeley Lake Ready Mix Company (collectively, "Richards") appeal from the decision of the District Court for the Fourth Judicial District, Missoula County, granting summary judgment in favor of JTL Group, Inc. (hereinafter "JTL"). We affirm.

¶2     We restate the issues on appeal as follows:

1. Did the District Court err in determining that the Sale Agreement was the parties' final and complete agreement?

2. Did the District Court err in determining that the language of the Sale Agreement was unambiguous?

3. Did the District Court err in refusing to consider parol evidence under the statutory exceptions to the parol evidence rule?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     JTL is a Montana corporation doing business in several western Montana counties. In 2003, JTL owned the Seeley Lake Ready Mix plant (hereinafter "SLRM"). JTL also owned several other concrete plants including Kalispell Ready Mix, Polson Ready Mix, and Missoula Ready Mix. John Richards, a construction business and gravel pit owner in the Seeley Lake area, wanted to enter the ready mix concrete business and contacted JTL. Richards and JTL thereafter entered into a written agreement (hereinafter "Sale Agreement") dated September 30, 2003, followed by a closing on October 1, 2003, in Seeley Lake.

2

¶4     The Sale Agreement took the form of a one-page letter addressed to Richards on Polson Ready Mix letterhead from JTL general manager Butch Woolard, who signed the Sale Agreement on behalf of JTL.   The Sale Agreement included the subject line "Re: Purchase of Seeley Lake Ready Mix/SLRM" and then listed several terms as follows:

> The following are terms that have been agreed upon:
>
> 1.     Non-Compete Agreement-Territory to include the area north and east of Greenough Hill, mile post marker 22.3 on Hwy #200 and nothing south of Swan Lake.  The non-compete territory does not include Montana State Highway projects, as we want the opportunity to bid on these.  Any concrete delivered by MRM [Missoula Ready Mix], JTL, affiliates, successors, or assigns, in the non-compete territory, we agree to pay John Richards $5.00[1] per cubic yard.
>
> 2.     At the time of the closing, October 1, 2003 in Seeley Lake, Montana, this will be a cash sale, payable by a bank issued cashier's check in the amount of $67,000 dollars payable to JTL Group, Inc.
>
> 3.     MRM will provide support to SLRM to help the continued success of SLRM.  This will include help with mix designs, supply sources and business consulting.

The Sale Agreement also enumerated the assets of the sale, including three mixer trucks, a batch plant and control trailer, two cement trailers, and a truck mounted blower.

¶5     The parties contemporaneously executed a second page entitled "Amendment #1," regarding JTL's payment to Richards for continued batching of concrete at SLRM.  The Amendment stated:

> As of October 1, 2003, MRM agrees to pay John Richards $5.00 per cubic yard to batch at the Seeley Lake Plant for the bridge on the Blackfoot River at the Jct of Hwy 200 and Hwy 141.

_____

[1] The provision agreeing to pay $5 per cubic yard was modified to $7 per cubic yard the following day in writing and initialed by Woolard and Richards on the Sale Agreement.

All Sales after September 30, 2003 are to be John Richards/SLRM proceeds.

That same day, the parties also signed a third one-page document in which JTL agreed to rent Richards a truck at $50 per hour "until freeze-up" (hereinafter "Rental Agreement"). It contained no references to the sale of SLRM. Both Woolard and Richards signed and dated the amendment as well as the Rental Agreement. Shortly after the closing, Richards incorporated as Seeley Lake Ready Mix Company and commenced business.

¶6 On October 3, 2003, MRM's plant manager, John Young, sent a letter to MRM customers, stating, in pertinent part:

> This letter is to inform you, Missoula Ready Mix is no longer the owner of Seeley Lake Ready Mix. The Seeley Lake Plant is still open with the same name and phone number. We would like to thank you for the opportunity to be of service to you these past years. We are still available to serve your needs in the Potomac Valley up to Greenough Hill.
>
> Again thank you for your past business and please remember we still have Pumps, Conveyors, and concrete supplies available to service your needs in the Seeley Lake market.

This letter, known as the "Customer Letter," also listed the current customer prices for pumps and conveyors.

¶7 On May 25, 2005, Richards filed suit against JTL, alleging that the parties had a covenant not to compete, which JTL violated by continuing to do business in the "non-compete territory." Richards claimed that JTL induced Richards to purchase SLRM by promising non-competition in the immediate vicinity and promising support for SLRM. The complaint further alleged that JTL agreed to provide Richards with a customer list but had failed to do so. Richards claimed that JTL's actions breached the implied

4

covenant of good faith and fair dealing and constituted actual malice and, as a result of JTL's competition, he suffered lost profits, sales, and goodwill. Richards sought damages and a permanent injunction to prevent JTL from further breaching the asserted covenant not to compete.

¶8 JTL denied Richards' allegations and asserted that JTL did not agree to sell the goodwill of the business to Richards or to refrain from carrying on business within the area specified in the Sale Agreement. JTL's motion for summary judgment argued that nothing in plain language of the Sale Agreement precluded it from doing business in the non-compete territory and that, to the contrary, the Sale Agreement's provision that JTL would pay Richards $7 per cubic yard for concrete delivered in the territory as well as the amendment regarding batching of concrete "unambiguously contemplate" that JTL *would* do business in the non-compete territory. JTL further asserted that, contrary to Richards' assertions, the Sale Agreement neither restricted the price that JTL could charge for concrete delivered to the territory nor required JTL to furnish Richards with a customer list. Finally, JTL argued that parol evidence was inadmissible to establish oral agreements not set forth in the written agreement.

¶9 Richards' response to JTL's summary judgment motion asserted the court should look at circumstances and contemporaneous oral and written representations in order to interpret and expand upon the Sale Agreement. Richards asserted that the Sale Agreement was ambiguous, and as such, extrinsic evidence was admissible to determine the parties' intent. Richards argued that the parol evidence rule did not preclude consideration of this evidence as the Sale Agreement lacked a merger or integration

5

clause and there were aspects of the deal that were not in the written agreement, such as the purported agreement to supply Richards with a customer list. Richards also contended that the evidence was admissible under the § 28-2-905(2), MCA, exception to the parol evidence rule allowing consideration of extrinsic evidence when there is an allegation of fraud.

¶10 The District Court issued an order on December 18, 2006, granting JTL's motion for summary judgment. The court determined that the Sale Agreement was final and complete, as there were no other written agreements to the contrary, and rejected Richards' assertion that the Customer Letter was evidence of an executed oral agreement modifying the written contract or a signed memorandum of a separate agreement for JTL not to compete in the territory. The court also concluded that the Sale Agreement superseded all the preceding and accompanying oral negotiations or stipulations and was not reasonably subject to two different interpretations. The court determined the Sale Agreement did not impose an obligation on JTL to charge customers a certain price for concrete, but simply required JTL to pay Richards $7 per cubic yard for any concrete delivered within the territory, and did not require JTL to furnish Richards with a customer list. Based on these conclusions, the District Court dismissed all of Richards' claims.

## STANDARD OF REVIEW

¶11 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. *Phelps v. Frampton*, 2007 MT 263, ¶ 15, 339 Mont. 330, 170 P.3d 474. Rule 56(c) provides that

6

summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c); *Bitterroot Inter. Sys. v. West. Star Trucks*, 2007 MT 48, ¶ 32, 336 Mont. 145, 153 P.3d 627.

¶12 The moving party bears the initial burden of demonstrating there is no genuine issue of material fact and entitlement to judgment as a matter of law. *Phelps*, ¶ 16. "Once the moving party has met its burden, the opposing party must, in order to raise a genuine issue of material fact, present substantial evidence essential to one or more elements of its case rather than mere conclusory or speculative statements." *Reisbeck v. Farmers Ins. Exchange*, 2007 MT 171, ¶ 8, 338 Mont. 171, 163 P.3d 1289. We draw all reasonable inferences in favor of the party opposing summary judgment. *Bitterroot Inter. Sys.*, ¶ 32. "Summary judgment is an extreme remedy that should never be a substitute for a trial on the merits if a controversy exists over a material fact." *Anderson v. Stokes*, 2007 MT 166, ¶ 15, 338 Mont. 118, 163 P.3d 1273. Whether the moving party is entitled to judgment as a matter of law is a legal conclusion, which we review for correctness. *Phelps*, ¶ 16.

**DISCUSSION**

¶13 *Issue One. Did the District Court err in determining that the Sale Agreement was the parties' final and complete agreement?*

¶14 The construction and interpretation of a contract is a question of law. *Mary J. Baker Revoc. Trust v. Cenex Harvest*, 2007 MT 159, ¶ 19, 338 Mont. 41, 164 P.3d 851.

7

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter." Section 28-3-303, MCA. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Section 28-3-401, MCA; *see also Carelli v. Hall*, 279 Mont. 202, 209, 926 P.2d 756, 761 (1996) ("Where the language of an agreement is clear and unambiguous and, as a result, susceptible to only one interpretation, the duty of the court is to apply the language as written.").

¶15 The District Court concluded that the Sale Agreement was the final and complete agreement of the parties and declined to consider any parol evidence. Richards argues that the District Court erred by excluding consideration of extrinsic evidence about the agreement, contending the District Court should have considered sworn testimony and the Customer Letter in support of Richards' claims that JTL agreed to refrain from doing business in the non-compete territory, charge its customers in the non-compete territory a $7 surcharge over Richards' named price on every cubic yard of concrete delivered, with the surcharge to be paid to Richards, and provide Richards with a customer list. Richards further contends that the Customer Letter constituted either an executed oral agreement or a separate agreement not to compete. Richards argues that each of these were part of the

8

parties' agreement, that JTL failed to perform them, and that they represented disputed issues of material fact precluding summary judgment that the Sale Agreement was "final and complete."

¶16 As a general rule, the parol evidence rule "precludes the admission of extrinsic evidence of an unambiguous integrated writing in any situation involving parties to the instrument when the rights and duties created by the document are the dispositive issue." *In re Marriage of Olson*, 2005 MT 57, ¶ 17, 326 Mont. 224, 108 P.3d 493; *see also Black's Law Dictionary* 1149-50 (Bryan A. Garner ed., 8th ed., West 2004) (the parol evidence rule is "[t]he common-law principle that a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing."). Sections 28-2-904 and 905(1), MCA, are Montana's articulation of the parol evidence rule. *Baker Revoc. Trust*, ¶ 21 n. 2. Section 28-2-904, MCA, provides that when a contract is executed in writing, the writing "supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Section 28-2-905(1), MCA, further states that "[w]henever the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms." In *Brimstone Min., Inc. v. Glaus*, 2003 MT 236, 317 Mont. 236, 77 P.3d 175, we held that the parol evidence rule "only bars evidence of oral agreements when the terms of a written agreement indicate the intent of the parties that the written memorialization represents the complete and final agreement between the parties."

9

*Brimstone*, ¶ 46. We noted that the intention that the writing represents the final and complete agreement is often expressed with an integration clause. *Brimstone*, ¶ 46.

¶17 The Sale Agreement lacks an integration or merger clause; however, this absence is not necessarily fatal to JTL's argument that the Sale Agreement was final and complete. *See Jake C. Byers, Inc. v. J.B.C. Investments*, 834 S.W.2d 806, 813 (Mo. App. E. Dist. 1992) ("the absence of a merger clause is likewise not determinative; the writing still may be complete on its face.").

¶18 Further, in *Lindey's, Inc. v. Professional Consultants, Inc.*, 244 Mont 238, 797 P.2d 920 (1990), we held that if a particular element of the alleged extrinsic negotiations is mentioned, covered, or dealt with in the writing, then the writing is presumed to represent all the transactions on that element. *Lindey's*, 244 Mont. at 245, 797 P.2d at 925. This would raise a presumption that the Sale Agreement covered Richards' claim that JTL agreed not to compete within the territory, as the Sale Agreement addressed and defined the non-compete territory, and Richards' claim that JTL agreed to impose a $7 surcharge upon its Seeley Lake customers to be paid to Richards, as this issue is "mentioned, covered, or dealt with" by the language providing that JTL would pay Richards' $7 per cubic yard for any concrete delivered in the non-compete territory. Thus, the Sale Agreement is presumed to represent all the transactions on these elements.

¶19 Noting the requirement that the parties' intention is to be ascertained, if possible, by the writing alone under § 28-3-303, MCA, the District Court concluded the language of the Sale Agreement demonstrated it was the complete and final agreement of the parties. It reasoned that, despite the Agreement's use of terms such as "Non-compete

10

Agreement" and "non-compete territory," the "clear language of the contract contemplates that the Defendant could sell concrete in the Seeley Lake Territory" because of the $7 per cubic yard surcharge the contract assesses against JTL for doing so, a provision which would have to be removed from the contract to accept Richards' interpretation. The court reasoned that the Sale Agreement imposed no obligation on JTL regarding the prices it charges customers, only the payment of the $7 surcharge, and rejected Richards' argument that such a rendering is absurd because of the resulting economic impact upon Richards, because there was no other way to read the plain language of the Sale Agreement. The court concluded the Sale Agreement did not require JTL to provide a customer list under its plain terms. Even assuming the validity of Richards' argument that this was to be a sale of the business and goodwill, and not just a sale of assets, the court concluded that Richards had failed to demonstrate that a customer list would mandatorily be included within a sale of goodwill.[2] Based on its reading of the Sale Agreement's language, it rejected the extrinsic evidence offered by Richards. We concur with this analysis.

¶20 Richards also argues that the Customer Letter evidenced an executed oral agreement that modified the Sale Agreement or constituted a signed memorandum of a separate and subsequent agreement not to compete. We first consider whether the customer letter represented an executed oral agreement modifying the Sale Agreement. Under § 28-2-1602, MCA, "[a] contract in writing may be altered by a contract in writing

---

[2] The goodwill issue, discussed below, is also raised by Richards as part of its argument that the Sale Agreement is ambiguous.

or by an executed oral agreement, and not otherwise." An oral agreement modifying a written agreement is executed when its terms have been fully performed. *DeNiro v. Gasvoda*, 1999 MT 129, ¶ 13, 294 Mont. 478, 982 P.2d 1002; *Lemley v. Allen*, 203 Mont. 37, 41, 659 P.2d 262, 265 (1983). Full execution must occur on both sides of the agreement. *Westfork Const. Co. v. Nelcon, Inc.*, 265 Mont. 398, 402-03, 877 P.2d 481, 484 (1994). Performance on one side is not sufficient. *Winkel v. Family Health Care, P.C.*, 205 Mont. 40, 45, 668 P.2d 208, 210 (1983).

¶21 Richards points to Woolard's deposition testimony in which Woolard testified that he requested that MRM plant manager John Young send a letter to MRM's customers stating that MRM was no longer the owner of SLRM and that MRM was still available to serve their needs in the Potomac Valley up to Greenough Hill. Richards contends this letter memorializes that he and JTL agreed that JTL was no longer going to compete with SLRM in the sale of concrete within the "non-compete territory." The District Court rejected this claim because JTL had not performed what Richards claims JTL agreed to do—i.e., not deliver concrete in the "non-compete territory." We agree with this analysis, as any purported oral agreement to not deliver concrete has not been executed by JTL. To the contrary, JTL has continued to deliver concrete to the area. As the District Court noted, "[t]he sending of the Customer Letter may evidence an executed oral agreement *to send a customer letter*, but it does not evidence an executed oral agreement to not deliver concrete in the Seeley Lake Territory."

¶22 Regarding Richards' claim that the Customer Letter was a signed memorandum of a separate and subsequent agreement not to compete, the letter does not, on its face,

contain any language expressly prohibiting JTL from competing in the territory or pricing competitively. Although the letter indicates that JTL is "still available to serve your needs in the Potomac Valley up to Greenough Hill," this language does not constitute a contractual prohibition on doing business elsewhere in the territory. Indeed, the letter's statement that JTL still had "Pumps, Conveyors, and concrete supplies available to service your needs in the Seeley Lake market" contemplates just the opposite—that JTL would, in fact, continue to do business within the territory. Accordingly, we hold that the Customer Letter did not constitute a written memorandum of a separate and subsequent agreement not to compete.

¶23 In *Brimstone*, we noted that "the mere fact there is more than one written agreement between the same parties regarding the same area indicates this is a unique situation where the parties did not intend the written documents to memorialize a final and complete agreement." *Brimstone*, ¶ 47. We concluded that the parol evidence rule did not apply in *Brimstone* because there was no evidence that the parties intended the letters at issue to represent their final and complete agreement. *Brimstone*, ¶ 47. Our conclusions here distinguish this case from *Brimstone*, as there is only one written agreement between the parties on the matter, entered with a contemporaneously executed amendment.

¶24 We conclude that the District Court did not err by determining the Sale Agreement was the final and complete agreement of the parties. Because the Sale Agreement was final and complete, it supersedes any of the previous or contemporaneous oral negotiations or stipulations, pursuant to § 28-2-904, MCA. The language of the Sale

13

Agreement governs its interpretation if the language is sufficiently clear, § 28-3-401, MCA, and we look to the writing alone to determine the parties' intention. Section 28-3-303, MCA. We hold that the District Court did not err in refusing to hear parol evidence in support of Richards' contentions.

¶25 ***Issue Two. Did the District Court err in determining that the language of the Sale Agreement was unambiguous?***

**A.     Whether the Sale Agreement was ambiguous on its face.**

¶26 Whether an ambiguity exists in a contract is a matter of law. *Perf. Mach. Co., Inc. v. Yellowstone Mt. Club*, 2007 MT 250, ¶ 39, 339 Mont. 259, 169 P.3d 394. An ambiguity's existence must be determined on an objective basis. *Perf. Mach. Co.*, ¶ 39. An ambiguity exists where the language of the contract, as a whole, could reasonably be subject to two different meanings. *Czajkowski v. Meyers*, 2007 MT 292, ¶ 21, 339 Mont. 503, 172 P.3d 94. Mere disagreement as to the interpretation of a written instrument does not automatically create an ambiguity. *Creveling v. Ingold*, 2006 MT 57, ¶ 8, 331 Mont. 322, 132 P.3d 531; *see also Baker Revoc. Trust*, ¶ 70 ("a conclusion of ambiguity is not compelled by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation." (citing Richard A. Lord, *Williston on Contracts* vol. 11, § 30:4 at 51-54 (4th ed., West 1999)). If the language of the contract is ambiguous, a factual determination must be made as to the parties' intent in entering into the contract. *Baker Revoc. Trust*, ¶ 19. Where there is an ambiguity, the court may

turn to extrinsic evidence to determine the parties' intent. *Ophus v. Fritz*, 2000 MT 251, ¶ 29, 301 Mont. 447, 11 P.3d 1192; *Carelli*, 279 Mont. at 209, 926 P.2d at 761.

¶27 Richards claims the "non-compete" language in the Sale Agreement is ambiguous in regard to JTL's non-competition obligation. Richards' interpretation of the terms "Non-Compete Agreement" and "non-compete territory" is that JTL would discontinue doing business in the Seeley Lake area and JTL would accomplish this by "weaning" former JTL customers over to SLRM by charging them $7 per yard more than the SLRM price. The District Court disagreed, concluding that the language of the Sale Agreement was unambiguous and clearly did not prevent JTL from doing business in the non-compete territory, but only obligated JTL to pay Richards $7 per cubic yard for deliveries within the territory.

¶28 We likewise reject Richards' argument that the language is ambiguous. Richards has failed to demonstrate that the Sale Agreement is subject to two reasonable, but different meanings. Richards cites *Carelli* for the proposition that an ambiguity exists when a contract is subject to two different interpretations, *Carelli*, 279 Mont. at 209, 926 P.2d at 761, but the different interpretations must be reasonable. *See Perf. Mach. Co.*, ¶ 39 ("an ambiguity exists only if the language is susceptible to at least two *reasonable* but conflicting meanings" (emphasis added)). While the heading on the contract provision at issue reads "Non-Compete Agreement-Territory," the language of the provision describes the agreed-upon territory, exempts Montana State Highway projects from this territory, and then simply describes JTL's obligation to pay Richards if JTL delivers concrete in the territory. The plain language of the Sale Agreement does not

15

prevent JTL from selling concrete within the "non-compete territory." The "Non-Compete Agreement" is thus akin to a penalty that JTL must pay to Richards to do business in the territory, rather than a prohibition against doing business. In light of the plain language, Richards' interpretation of the provision is unreasonable. Taken as a whole, the Sale Agreement is unambiguous on these points. To conclude that Richards' interpretation of the non-compete provisions is a reasonable one would require insertion of language into the Sale Agreement and would contradict the rule that we apply the language of the contract as written, when the language is clear and unambiguous.

¶29 In support of his claim that JTL promised to provide a customer list, Richards argues that the agreement is ambiguous regarding whether the sale was for the SLRM business as a whole or simply a sale of SLRM assets. Richards claims that a customer list is not commonly provided in an asset sale and thus, if the sale was for the business, his claim that a customer list was to be provided would be established. Thus, Richards argues this ambiguity constitutes a material factual issue, which prevents the entry of summary judgment.

¶30 However, even assuming, *arguendo*, that the sale was one for the SLRM business and goodwill, this would not establish that a customer list would necessarily have been provided to Richards. While it is true that "goodwill can pass by implication on the transfer of a business, even though not mentioned in a written contract of sale" (*Baldwin v. Stuber*, 182 Mont. 501, 507, 597 P.2d 1135, 1138-39 (1979)), we agree with the District Court that Richards failed to demonstrate a customer list always passes to the purchaser in a sale of goodwill. While the type of sale contemplated by the parties may

16

indeed constitute an ambiguity, it is not a material factual issue preventing summary judgment. There is nothing in the Sale Agreement providing for a customer list, and we have already determined the Agreement, by its unambiguous terms, did not prohibit JTL from continuing to do business in the territory. While we held in *Baker Revoc. Trust*, ¶ 55, that a court can consider objective evidence of "the circumstances under which [the instrument] was made" for the purpose of aiding the court in determining whether an ambiguity exists, Richards is not asserting an ambiguity exists in the language of the agreement. Rather, Richards is arguing that resolution of an ambiguity about the kind of sale at issue will allow an inference to be drawn about whether the parties agreed to a term not stated in the Agreement. Under these facts, we cannot conclude that resolution of this ambiguity is a material issue of fact prohibiting summary judgment.

¶31 Richards has thus failed to show the Sale Agreement is ambiguous on its face by demonstrating the language is subject to two reasonable but conflicting meanings.

**B.  Whether parol evidence should be permitted pursuant to Sections 28-2-905(2) and 1-4-102, MCA, to determine whether the language of the Sale Agreement was ambiguous.**

¶32 Richards also argues the District Court should have considered parol evidence pursuant to § 28-2-905(2), MCA, which permits a court to consider "other evidence of the circumstances under which the agreement was made or to which it relates, as described in 1-4-102 . . . ." In turn, § 1-4-102, MCA, states:

> [f]or the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument and of the parties to it, may also be shown so that the judge is placed in the position of those whose language the judge is to interpret.

17

Similarly, § 28-3-402, MCA, provides that "[a] contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." Richards cites *Baker Revoc. Trust* and *Reisbeck* in support of his argument.

¶33 We provided clarification of the application of § 1-4-102, MCA, in *Baker Revoc. Trust*, holding that the circumstances under which an instrument was made may be considered to aid the court in determining, as a preliminary matter, whether the instrument "contains an ambiguity." *Baker Revoc. Trust*, ¶ 53. We emphasized, however, that not all circumstances are admissible to determine whether the instrument contains an ambiguity, as the determination must be made on an objective basis. *Baker Revoc. Trust*, ¶ 53. We stated "an instrument does not contain an ambiguity simply because the parties have or suggest opposing interpretations thereof or disagree as to whether the language is reasonably open to just one interpretation." *Baker Revoc. Trust*, ¶ 53. On this point, we quoted the Seventh Circuit's holding that subjective evidence of ambiguity is "the testimony of the parties themselves as to what they believe the contract means, which is invariably self-serving, inherently difficult to verify and thus, inadmissible" whereas objective evidence of ambiguity is evidence "that can be supplied by disinterested third parties, such as custom or usage of the trade. This kind of evidence is admissible because the ability of one of the contracting parties to fabricate such evidence is limited." *Baker Revoc. Trust*, ¶ 53 (quoting *Home Ins. Co. v. Chicago and Nw. Transp. Co.*, 56 F.3d 763, 768 (7th Cir. 1995)). Accordingly, we held that a court could consider objective evidence of the circumstances under which an agreement was made to determine if the instrument contained an ambiguity. *Baker Revoc. Trust*, ¶¶ 55,

67; *Reisbeck*, ¶ 15. "If the court determines that the instrument contains no ambiguity, then the extrinsic evidence may not be considered further." *Baker Revoc. Trust*, ¶ 55.

¶34 In support of his argument that extrinsic evidence demonstrates that the Sale Agreement was ambiguous, Richards references his affidavit in which he said that, based on Woolard's representations, he "understood" the intent of the Non-Compete Agreement was that JTL "would not compete with SLRM and me in the Seeley Lake market" excepting state highway projects and that JTL would essentially price themselves out of the Seeley Lake market by charging customers in that area $7 per yard more than Richards' SLRM prices to "wean" customers from JTL to SLRM. However, testimony of the parties themselves is the primary example of subjective evidence of ambiguity, which, as the Seventh Circuit explained, is "invariably self-serving, inherently difficult to verify and thus, inadmissible." *Home Ins. Co.*, 56 F.3d at 768.

¶35 Next, Richards references First Valley Bank president Miller's deposition testimony that, based on the discussion between Richards and Woolard, he likewise understood that JTL would not compete in the area and that the $7 per yard charge was a premium JTL would impose so as to send customers to Richards. Finally, Richards references Woolard's deposition testimony in which Woolard stated that JTL "wouldn't competitively price up there, competitively with whatever John Richards' price was."

¶36 However, even assuming *arguendo* that Miller's and Woolard's testimony establishes that Richards and JTL had an oral agreement that JTL would charge its customers a $7 per yard surcharge above what SLRM charged, the testimony does not demonstrate that any term in the Sale Agreement is ambiguous, as it does not render the

19

language of the Agreement susceptible to the meaning advocated by Richards. The language clearly stated that JTL would pay Richards $7 per cubic yard for deliveries made to the territory. Rather, this extrinsic evidence only goes to Richards' attempt to insert language that is not in the Sale Agreement, which is something that we may not do. *See* § 1-4-101, MCA; *Baker Revoc. Trust*, ¶ 73. We thus conclude that Richards has failed to present any objective evidence of ambiguity that must be considered in interpreting the Sale Agreement.

¶37 ***Issue Three. Did the District Court err in refusing to consider parol evidence under the statutory exceptions to the parol evidence rule?***

**A.     Section 28-2-905(1)(a)-(b), MCA, exceptions to the parol evidence rule.**

¶38 Richards contends that the exceptions enumerated in § 28-2-905(1)(a), MCA, (when a mistake or imperfection of the writing is put in issue by the pleadings) and (1)(b) (when the validity of the agreement is the fact in dispute), apply in this case. However, Richards failed to cite legal authority or present any concrete analysis supporting either of these contentions, and we decline to consider his unsupported arguments on appeal. *See* M. R. App. P. 12(1)f ("The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes, and pages of the record relied on").

**B.     Section 28-2-905(2), MCA, exception for evidence to establish fraud.**

¶39 Finally, Richards argues that parol evidence is admissible under § 28-2-905(2), MCA, which excepts from the rule evidence offered to establish illegality or fraud. In his complaint, Richards alleged that:

20

JTL induced Mr. Richards to make this purchase by promising non-competition in the immediate vicinity and promising "support to SLRM to help the continued success of SLRM." [Citation omitted.] JTL never intended to be bound by the terms of its agreement or its promises and as such negotiated the covenant in bad faith.

¶40 Actual fraud consists of "acts committed by a party to the contract or with his connivance with intent to deceive another party thereto or to induce him to enter into the contract" including "a promise made without any intention of performing it . . . ." Section 28-2-405(4), MCA. When a party alleges fraud, parol evidence may be considered by the jury. *Savik v. Entech, Inc.*, 278 Mont. 152, 159, 923 P.2d 1091, 1095 (1996). We have said that when a party alleges fraud in the inducement, "it is incumbent upon the district court to admit parol evidence on the question" reasoning that "[f]or a jury to adequately consider a party's claim of fraudulent inducement, it is critical that it consider evidence outside of the written agreement as such evidence goes to the heart of the claim." *Savik*, 278 Mont. at 158, 923 P.2d at 1095.

¶41 The § 28-2-905(2), MCA, fraud exception to the parol evidence rule is not without limitation, however. In *Sherrodd, Inc. v. Morrison-Knudsen, Co.*, 249 Mont. 282, 815 P.2d 1135 (1991), we held that the fraud exception "only applies when the alleged fraud does not relate directly to the subject of the contract. Where an alleged oral promise directly contradicts the terms of an express written contract, the parol evidence rule applies." *Sherrodd, Inc.*, 249 Mont. at 285, 815 P.2d at 1137.

¶42 Richards' fraud complaint rests on the assertion that JTL induced Richards to enter the agreement by "promising non-competition." However, the core of the Sale Agreement is precisely "non-competition," the express terms of which we have

21

extensively reviewed herein and found to be unambiguous. Clearly, the fraud alleged by Richards directly relates to the subject of the contract. As such, the fraud exception to the parol evidence rule is not applicable under *Sherrodd*, and the District Court did not err in refusing to consider extrinsic evidence on this matter.

¶43 Affirmed.

/S/ JIM RICE

We concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON

Justice Brian Morris dissents.

¶44 I respectfully dissent. The Court determines that the Sales Agreement constitutes a final and complete agreement of the parties. ¶ 24. The Court further determines that this final and complete agreement of the parties "supersedes" any previous or contemporaneous oral agreement between the parties. ¶ 24. The Court concludes that the Sales Agreement is clear and unambiguous on its face. ¶ 31. As a result, the Court determines that Richards purchased three used dump trucks and some concrete equipment for $67,000. I cannot agree.

¶45 In reaching its conclusion the Court concedes that the Sales Agreement lacks an integration or merger clause. ¶ 17. The Court further recognizes that the Sales Agreement contains terms such as "non-compete agreement," "non-compete territory," and a $7 per cubic yard surcharge on any concrete delivered by JTL in the "non-compete

22

territory." ¶ 19. In fact, the non-compete provision defines the agreed-upon territory, exempts Montana State Highway projects from this non-compete territory, and describes JTL's obligation to pay the $7 surcharge to Richards.

¶46 The Court brushes aside Richards's claim that he intended to purchase the concrete business *and* the business goodwill on the grounds that the Sales Agreement makes no mention of any customer list. The Court fails to explain, however, why the purchase of three dump trucks and some concrete equipment would prompt the seller to provide a written document that describes territories in which the seller will not compete with the buyer and projects within the territories with which the seller will compete with the buyer. It seems that a simple bill of sale for the three dump trucks and the concrete equipment would have sufficed if that was all that the parties had intended to transfer through the Sales Agreement. I certainly would be surprised if a private seller of a used vehicle provided me as the buyer with a sales contract that set forth areas within which the seller would not compete with me and imposed a penalty upon the seller for any efforts to compete against me within the territory.

¶47 The meaning and interpretation of these terms within the Sales Agreement at the very least create ambiguities that in turn raise genuine issues of material fact that should have precluded summary judgment. *Baker Revoc. Trust*, ¶ 19; M. R. Civ. P. 56(c); *Bitterroot Inter. Sys.*, ¶ 32. I dissent from the Court's failure to remand this matter for a trial on the merits to determine the parties' intent in entering into the Sales Agreement.

/S/ BRIAN MORRIS